UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JONATHAN GOULD, on behalf of St. Louis–Kansas City Carpenters Regional Council, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 4:19 CV 925 DDN |
| ALBERT BOND, | ) ) | |
| Defendant and | ) ) ) | |
| ST. LOUIS–KANSAS CITY CARPENTERS REGIONAL COUNCIL, | ) ) ) ) | |
| Intervenor Defendant. | ) | |

## **MEMORANDUM OPINION**

This matter is before the Court on the motion of plaintiff Jonathan Gould for leave to file a verified complaint under 29 U.S.C. § 501(b). Defendant Albert Bond and intervenor defendant St. Louis-Kansas City Carpenters Regional Council ("CRC") oppose the motion. The parties have consented to the exercise of plenary authority by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b).

## **Background**

Plaintiff brought this action on behalf of intervenor CRC, alleging breaches of fiduciary duties owed to CRC by defendant Albert Bond, who is currently the Executive Secretary of CRC. According to plaintiff's verified proposed complaint, plaintiff is a member of CRC and was previously employed as a business agent for the union. Prior to the filing of this case, plaintiff brought a wrongful termination claim against CRC in 2016

in the Circuit Court of the City of St. Louis, Missouri. *Jonathan Gould v. St. Louis-Kansas City Carpenters Regional Council et al.,* No. 1622-CC09954. (Doc. 17, Ex. 1). That case is still pending.

Plaintiff alleges that defendant ignored and blatantly violated CRC policies, resulting both in personal benefit to defendant and other CRC officers, and loss to CRC in the amount of hundreds of thousands of dollars. Specifically, plaintiff claims that CRC business agents and executive board members receive weekly vehicle allowances of $300, and approximately $1000 per year for auto insurance. This allowance is counted as income, and the CRC pays approximately $15,600 per year in taxes on this income per employee, or nearly $800,000 per year in additional taxes. Plaintiff argues this should be set aside as a benefit rather than being included in weekly salaries. Plaintiff also claims that CRC pays into each business agent's and executive board member's pension at least 13 percent of their salary. Plaintiff argues that this is excessive compensation and improperly inflates pensions. Finally, plaintiff claims that certain funds have been misappropriated to pay for personal, non-business-related expenses. (Doc. 1 at 6-9).

According to plaintiff, he repeatedly challenged these practices, beginning in 2007. (*Id.*). In January 2018, he sent defendant a formal demand letter under 29 U.S.C. § 501(b). (*Id.* at 11). On January 23, 2018, CRC answered plaintiff's demand, stating "the Council will launch a thorough and comprehensive investigation of [plaintiff's] allegations," acknowledging that the CRC has "a duty both to the Council and our 22,000 members to remove all doubt respecting whether we are fulfilling our fiduciary duties as required by federal law and the Council's governing documents." (*Id.* at 12). Defendant stated it would retain the services of Calibre CPA Group to investigate. (*Id.*).

Plaintiff challenged Calibre's impartiality, as a CRC-affiliated group, the International Carpenters' Union, hired the firm from 2012 to 2016, paying $330,000 in that time. Plaintiff asked that he be permitted to share documents directly with Calibre to ensure their accounting was accurate. CRC hired Mr. Clash-Drexler to facilitate communication between plaintiff and Calibre. In April 2018, Mr. Clash-Drexler advised plaintiff that CRC "provided Calibre with full cooperation and unrestricted access to the

relevant financial records, including the Council's regular audit reports, expense reimbursement policies, employee expense reports, credit card records, and back-up documents." (*Id.* at 12-13). Plaintiff was invited to share any documents with Mr. Clas-Drexler, and plaintiff sent 18,000 to Mr. Clash-Drexler to be forwarded to Calibre for the accounting. These documents consisted mostly of expense reports, credit card receipts, and other CRC accounting documents. (*Id.* at 13). Mr. Clash-Drexler informed plaintiff he would need to identify the documents showing specific violations of 29 U.S.C. § 501, and that he would not forward 18,000 documents to Calibre. Plaintiff then categorized the documents into three groups of 17,302 pages; 1,050 pages; and 102,318 pages respectively. (*Id.* at 13-14). Mr. Clash-Drexler informed plaintiff that these still were not sufficiently organized, and that they were beyond the scope of the accounting, which was limited to the "five specific instances of alleged misappropriation" that plaintiff had identified in his demand:

1. Flying spouses, significant others, and/or family members to Council conventions and conferences;

2. Paying expenses for spouses, significant others, and/or family members at Council conventions and conferences;

3. Paying for non-business related alcohol expenses at Council conventions and meetings;

4. Paying for non-business related lunches, dinners, and alcoholic drinks with Council funds and "petty cash;" and

5. Increasing salaries via an illegal vehicle policy that serves to fraudulently inflate their pensions.

(Doc. 1, Ex. 8).

Ultimately, Mr. Clash-Drexler did not forward any of the documents plaintiff provided on to Calibre. (Doc. 1 at 15). Calibre's review found that "there was missing documentation consisting of fourteen transactions amounting to $1,341 relating to one individual. Subsequent to the issuance of that report, we have been provided with supporting documentation for nine of those transactions. This documentation appears to satisfy the expense substantiation requirements of the DOL and IRS. Furthermore, it is

3

our understanding that $539 which is the total of the remaining five transactions for which support has not been provided, will be remitted by the one individual to [CRC]." (*Id.* at 16). Plaintiff concluded that this was a "sham" accounting and filed the instant action in this Court on April 16, 2019.

**Legal Standard**

Section 501 of the Labor-Management Reporting and Disclosure Act ("LMRDA") prescribes an officer's fiduciary duties and creates a federal cause of action for individual union members to sue if an officer has violated those fiduciary duties. This includes expending union money in a manner contrary to the union's constitution or bylaws, or holding union money for something other than the union's sole benefit. 29 U.S.C. § 501(a); *Kausler v. Campey*, 788 F.Supp. 423, 425 (E.D. Mo. 1992).

To proceed on an action under Section 501(b), a plaintiff union member must meet two conditions: (1) the union member must have requested an accounting of the union or requested the union to pursue "other appropriate relief," and "within a reasonable time after being requested to do so" the union refused or failed to do so; and (2) the union member must obtain leave of court "upon verified application [,"which application may be made ex parte,"] showing "good cause." 29 U.S.C. § 501(b).

Federal circuit courts have adopted three standards in evaluating these statutory requirements: first, *Horner*, followed by the Third, Eleventh, and D.C. Circuits, holds that the good cause requirement does not impose a heightened pleading standard or require a union member to show high likelihood of success on the merits, as it can be satisfied through ex parte application. *See Horner v. Ferron*, 362 F.2d 224, 228-29 (9th Cir. 1966). The Court may focus on the pleadings alone and generally not consider any defenses raised to the factual allegations. *Id.*; *see also Loretangeli v. Critelli,* 853 F.2d 186, 191 (3rd Cir. 1988); *Erkins v. Bryan,* 663 F.2d 1048, 1053 (11th Cir. 1981) (citing *Horner*, 362 F2d at 229); *George v. Local Union 639,* 98 F.3d 1419, 1422 (D.C. Cir. 1996).

Second, *Dinko*, adopted by the Second Circuit and followed by courts in this Circuit, requires a showing of "a reasonable likelihood of success and, with regard to any

material facts . . . a reasonable ground for belief in their existence." *Dinko v. Wall*, 531 F.2d 68, 75 (2d Cir. 1976). The Court's review under this standard may extend beyond the allegations of the complaint and may take all facts and circumstances into account. *Local 314 Nat. Post Office Mail Handlers v. National Post Office Mail Handlers*, 572 F. Supp. 133, 139 (E.D. Mo. 1983).

Third, *Hoffman*, followed by the Fifth Circuit, requires a showing that "(1) the misconduct alleged directly relates to duties enumerated in § 501(a); (2) given the derivative nature of the plaintiff's suit on behalf of the union, the plaintiff seeks remedies that would realistically benefit the union and/or its membership, (3) the alleged breaches in question were presented to the union, which then failed or refused to act on them," and this refusal "must in some way be objectively unreasonable . . . assessed from the point of view of the membership as a whole." *Hoffman v. Kramer*, 362 F.3d 308, 316–17 (5th Cir. 2004). The Fifth Circuit's standard gives the union's decision not to pursue a claim some deference, and emphasizes that the LMRDA "is not meant as a vehicle for judicial oversight of union activity, but only as a means of addressing unreasonable and arbitrary actions by union officials. The federal courts do not sit as a 'super-review' board of internal union grievances unless there is evidence of impropriety in the proceedings." *Id.* (quoting *United Food and Commercial Workers Int'l Union Local 911 v. United Food and Commercial Workers Int'l*, 301 F.3d 468, 475 (6th Cir. 2002)). The Fifth Circuit continues, "This deference is appropriate only when the democratic accountability of a union is not seriously at issue. Objectively reasonable determinations by disinterested union leaders not to bring an action seem to us a strong indication that the claims may be ill-suited as a springboard for judicial intervention into the management of a labor organization that is democratically accountable to its membership." *Id.*

While the Eighth Circuit has not expressly adopted any of the above standards, this Court has considered the statutory requirements of the LRMDA strictly, under the *Dinko* standard, requiring a plaintiff to show a "reasonable likelihood of success and, with regard to any material facts alleged, a reasonable ground for belief in their existence." *Local 314 Nat. Post Office Mail Handlers*, 572 F. Supp. at 139.

5

Section 501(b) aims to prevent groundless or vexatious suits against union officials. *Id.* At the same time, the fiduciary responsibilities set out in Section 501(a) are designed to protect union members. *Cowger v. Rohrbach*, 868 F.2d 1064, 1066 (9th Cir. 1989). Courts must balance these two policies when deciding whether the prerequisites set out in Section 501(b) are satisfied. *Id.*

## **Discussion**

Plaintiff argues he has been complaining of the union's wasteful and illegal spending for years, and that this action is brought for the benefit of thousands of dues-paying union members. He claims that defendant has failed to take appropriate remedial action, calling their accounting a "sham." Plaintiff argues that he has reached the good cause standard based on the substantive allegations in his complaint, and the Court should only consider substantive defenses at a later stage in the proceeding.

Defendant argues that plaintiff does not adequately represent the interests of Union members, because his individual wrongful discharge lawsuit against CRC is ongoing. Defendant also claims that plaintiff delayed too long in filing the lawsuit. Finally, defendant argues that plaintiff does not meet the statutory prerequisites for filing a Section 501(b) claim, because the union responded to plaintiff's demand by undergoing an audit and seeking reimbursement for inadequately documented expenses.

Intervenor CRC similarly argues that plaintiff is bringing this suit for his own benefit and not for the benefit of CRC, and that plaintiff cannot establish that CRC failed to take timely and appropriate action in response to plaintiff's request for an accounting in January 2018. CRC also argues that the actions of which plaintiff complains do not come within the scope of the enumerated fiduciary duties in Section 501(a).

The Court finds that plaintiff has failed to meet a statutory prerequisite: plaintiff has not shown that the union failed or refused to make a legitimate accounting. In January 2018, plaintiff made a demand to CRC, and the Union contracted an independent accounting firm, was audited, and was reimbursed for any inadequately documented

6

expenses. (Doc. 19, Exs. 12-13). Plaintiff argues that this accounting was a sham (Doc. 30 at 7, 8) such that it does not prevent him from bringing this suit.

Case law interpreting the requirement that a union member request appropriate action by the union and the union's subsequent activity is sparse. There have been several cases where unions made no response to a request and courts in those cases have permitted union members to file Section 501(b) claims after "a reasonable time" had elapsed. *See, e.g., See Adams–Lundy v. Ass'n of Professional Flight Attendants,* 844 F.2d 245, 248 (5th Cir. 1988) (union member may sue under section 501(b) after requesting the union "'sue or recover damages or secure an accounting or other appropriate relief'" and the union has refused to take action within a reasonable time following the request); *Erkins v. Bryan,* 663 F.2d 1048, 1052 (11th Cir. 1981) (petitioners may act after notifying union, requesting suit be brought, and union fails to take action within reasonable time).

Other cases have addressed union members who made no demand, but made a showing that a demand would be "futile." In such cases, courts have only occasionally permitted these plaintiffs to file, generally dismissing without prejudice to filing after compliance with the statute. *See, e.g., McNamara v. Johnston,* 522 F.2d 1157, 1163 (7th Cir. 1975) ("[I]t is apparent that a demand for relief would have been futile . . . [and] plaintiffs' failure to make such a request is excused."), *but see Flaherty v. Warehousemen, Garage & Serv. Station Emp. Local Union No. 334,* 574 F.2d 484, 487 (9th Cir. 1978) (rejecting the futility doctrine); *Coleman v. Brotherhood of Railway & Steamship Clerks*, 340 F.2d 206, 208-09 (2d Cir. 1965) (same).

And there has been at least one case similar to this one, where a plaintiff made a demand on which the union acted, but the plaintiff sued anyway. *Filippini v. Austin,* 106 F.R.D. 425, 430 (C.D. Cal. 1985). In that case, the union sued a union officer in state court in response to a union member's request, but the union member nevertheless filed a subsequent Section 501(b) claim in federal court. The federal district court dismissed, finding the union had not failed or refused to act, but was vigorously pursuing its claims.

In this case, plaintiff made his demand and CRC performed an accounting. The accounting revealed some discrepancies, which were resolved by either documentation or

reimbursement. CRC considered the matter resolved. Plaintiff alleges that this accounting was so limited and biased it amounted to a sham. However, the accounting addressed the five points listed in plaintiff's request, which encompass the bulk of the allegations in plaintiff's complaint. The dispositive issue here is whether Congress intended to give union members the ability to sue even when the union takes legitimate action and, if so, what kind of union action is sufficient to bar a union member's related Section 501(b) claim.

Congress created 501(b) to give union members a remedy when their union fails to address fiduciary breaches by union officers or employees. However, Congress was careful to balance the union members' need for a judicial remedy with the union's need to be protected from harassing, meritless litigation and unwarranted judicial intrusion in the processes of union democracy. *See Cowger*, 868 F.2d at 1068; *Horner*, 362 F.2d at 228; *Loretangeli*, 853 F.2d at 189.

The Court applies § 501 to defer to union decision-making in appropriate cases, while still allowing union members an avenue to address unreasonable and arbitrary actions by union officials. *See United Food and Commercial Workers Int'l Union Local 911 v. United Food and Commercial Workers Int'l,* 301 F.3d 468, 475 (6th Cir. 2002) ("The federal courts do not sit as a 'super-review' board of internal union grievances unless there is evidence of impropriety in the proceedings."). As stated, this Court applied the strict *Dinko* standard in construing the good cause statutory requirement, *Local 314 Nat. Post Office Mail Handlers*, 572 F. Supp. at 139, and in this case the Court takes a similar approach to construing the statutory requirement of a union's failure to act. Accordingly, a union member who files a Section 501(b) lawsuit after a union has taken action in response to the member's request should show an objectively reasonable ground for belief that the union's accounting or other action was not legitimate. Plaintiff has not made such a showing here.

Plaintiff may not bring a claim under Section 501(b) on the facts alleged in the complaint.

Accordingly,

Plaintiff's motion for leave to file a verified complaint under 29 U.S.C. 501(b) is denied and the case is dismissed with prejudice. An appropriate Judgment Order is filed herewith.

                                          /S/    David D. Noce
                          **UNITED STATES MAGISTRATE JUDGE**

Signed on August 19, 2019.